UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:22-cv-23320-JEM

**DIANNA CRAVENER** and
**CHRISTIANAH ADARAMAJA**,
individually and
on behalf of all others similarly situated,   **CLASS ACTION**

    Plaintiff,   **JURY TRIAL DEMANDED**

v.

**SEDUCTION COSMETIC CENTER CORP**,

    Defendant.
_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Christianah Adaramaja and Dianna Cravener respond in opposition to Defendant Seduction Cosmetic Center Corp.'s Motion to Dismiss Plaintiffs' First Consolidated Class Action Complaint ("Mot." or "Motion"), [DE 38], and state:

**INTRODUCTION**

As requested in Plaintiffs' Motion to Stay, [DE 39], Plaintiffs respectfully submit that the Court should stay the case pending the outcome of *Drazen v. Pinto*, No. 21-10199 (11th Cir.), a case that is anticipated to overturn *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) and its ruling on TCPA text message standing. Separately, in *Muccio v. Global Motivation, Inc., et al.*, No. 23-10081 (11th Cir.), the Eleventh Circuit will decide standing under the FTSA for text message violations. The appellees in *Muccio* recently failed to file an opposition brief and, consequently, the Eleventh Circuit will soon rule on whether the receipt of unsolicited text messages in violation of the FTSA confers Article III standing.

But even if this Court is not inclined to stay the case, it should nevertheless deny Defendant's Motion to Dismiss.

First, as discussed below, Eleventh Circuit precedent supports a finding of standing where, as here, a plaintiff (Adaramaja) alleges unsolicited text messages sent in violation of the Do-Not-Call Registry provisions—which supports the conclusion that the plaintiff's peace was disturbed. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019) ("Similarly, this is not a problem for the class based on calls made to individuals on the National Do Not Call Registry, since those whose numbers are on the Registry and nevertheless received marketing calls suffered an injury that is traceable to Telecel's misconduct[.]"); *Walters v. Fast AC, Ltd. Liab. Co.*, No. 21-13879, 2023 U.S. App. LEXIS 2897, at *11 (11th Cir. Feb. 6, 2023) ("Walters's injuries go beyond FTL's noncompliant disclosures—he provided evidence of lost time, money, and ***peace***. These are garden-variety injuries in fact under Article III.") (emphasis supplied).

Second, and contrary to Defendant's contention, *Salcedo* does not change the outcome. Indeed, as recently observed by Judge Bloom, *Salcedo* merely holds that a "violation based solely on the receipt of a ***single***, unwanted text message is nonjusticiable." *Weitz v. Genting New World LLC*, No. 1:22-cv-23209-BLOOM, 2023 U.S. Dist. LEXIS 35169 (S.D. Fla. Feb. 28, 2023) (emphasis supplied); *see also Weister v. Vantage Point AI, LLC*, No. 8:21-cv-1250-SDM-AEP, 2022 U.S. Dist. LEXIS 139642 (M.D. Fla. Aug. 3, 2022) ("Although a single communication lacks — by definition — a harassing or hounding quality, the receipt of fifteen voicemails yields a qualitative change from the 'fleeting' annoyance in *Salcedo* to conduct bearing a 'close relationship' to the hounding and harassment actionable at common law.") (citations omitted).

Third, with respect to Plaintiffs' FTSA claims, Defendant's reliance on *Salcedo* is misplaced and the case is not binding upon this Court. Specifically, unlike the TCPA, the FTSA explicitly identifies

2

text messages as a form of violative communication. Accordingly, Defendant's reliance on the reasoning of *Salcedo* is flawed because it fails to fail to give any weight to the Florida legislature's judgment on the issue of whether unwanted text messages are harmful.

Accordingly, Plaintiffs request an order denying the Motion and allowing this case to proceed on the merits.

## ARGUMENT

**I.    Plaintiff Adaramaja Possesses Article III Standing for her TCPA Claims**.

Plaintiff Adaramaja alleges a claim under TCPA's do-not-call provisions pursuant to 47 U.S.C. § 227(c) and 64.1200(c). *See* Compl., [DE 34], at Count II. As held by the Eleventh Circuit in *Cordoba*, Plaintiff Adaramaja has Article III standing for her DNC claim:

> Similarly, this is not a problem for the class based on calls made to individuals on the National Do Not Call Registry, since those whose numbers are on the Registry and nevertheless received marketing calls suffered an injury that is traceable to Telecel's misconduct -- if Telecel had followed the law and not called numbers on the Registry, they would not have been injured.

942 F.3d at 1272.[1]

Defendant ignores *Cordoba* but cannot escape the holding of the case. Plaintiff alleges that she registered her telephone number on the National Do Not Call Registry. Compl. at ¶23. Notwithstanding Plaintiff's DNC registration, Defendant spammed Plaintiff with telephone solicitations. *Id*. at ¶19. Plaintiff was injured by Defendant's misconduct – and would not have been injured had Defendant followed the law – and therefore has Article III standing.

As numerous courts have explained, the harm here bears a "close relationship" with several common law analogues, chiefly intrusion upon seclusion and nuisance. At common law, invasions of

---

[1] "[T]he FCC interprets 'call'…to include both a voice call and a text message." *Pariseau v. Built USA, LLC*, No. 8:21-cv-2902-SDM-JSS, 2022 U.S. Dist. LEXIS 139321 (M.D. Fla. Aug. 5, 2022).

3

privacy, whether in obtaining and publicizing private facts or intruding upon a person's right to solitude and seclusions—invading the right to be let alone—was a recognized harm, and the TCPA's DNC regulations are designed to protect precisely that right and prevent precisely that harm. Of course, at common law, the point at which the harm became actionable could be quite high. For example, courts recognized liability for intrusion upon seclusion where "telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff." RESTATEMENT § 652B cmt. d. "The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy." *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020).

As then-Judge Barrett cogently explained:

> When *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a close relationship in kind, not degree. In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may "elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same kind of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.

*Id*. (cleaned up).

Other courts have agreed. *See, e.g.*, *Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (receipt of unwanted texts confers Article III standing because "the harms Congress sought to alleviate through passage of the TCPA closely relate to traditional claims, including claims for [intrusion upon seclusion,]" and, thus, "the district court correctly concluded that [the plaintiffs] 'need not allege any additional harm beyond the one Congress has identified'") (citations omitted); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191-92 (10th Cir. 2021) (agreeing with and adopting the *Gadelhak* analysis in the context of a debt collection call); *Van Patten v. Vertical Fitness Grp.*, LLC,

4

847 F.3d 1037, 1043 (9th Cir. 2017) (same). The same is true here: Congress identified a harm—receipt of unwanted text messages—that is closely analogous to the harm caused by intrusions upon seclusion, albeit in an amount potentially insufficient to establish entitlement to relief at common law, and elevated it to the status of legally vindicable.

To illustrate, consider a hypothetical where a telemarketer calls John Doe eleven times attempting to sell a widget. Frustrated and annoyed—and without knowledge as to how many times this is going to keep happening—John sues the telemarketer for the privacy invasions, bringing a claim for intrusion upon seclusion. A common law court might dismiss the intrusion-upon-seclusion claim on the merits. But the theory of the claim would not be unrecognizable—it is not that receiving unwanted calls is some novel, unheard-of basis for bringing an intrusion upon seclusion claim, but simply that eleven calls may not be enough. So, by providing a cause of action for receipt of a few unwanted calls, a legislature is not inventing a new theory of harm—it is simply reducing the number of calls necessary to secure relief under the statute compared to common law torts.

In addition to intrusion upon seclusion, the harm identified and elevated by the legislature bears a "close relationship" to the common law tort of public nuisance, as Judge Oldham explained:

> Robocalls and robotexts are nuisances. Congress banned them in the Telephone Consumer Protection Act of 1991 ("TCPA"). But as every American knows, there are companies—like the defendant in this case—who refuse to get that message while collectively sending millions of others.

*Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 688 (5th Cir. 2021).

This is because a public nuisance tort could be established by showing, inter alia, an "interference" with "the public comfort," such as, for example, bad odors or emitting dust. W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 90, at 643-44 (5th ed. 1984) (footnotes omitted).

An individual could bring such a case—not just a sovereign—so long as the nuisance impacted her in a way not shared by all other members of the public. *Cranor,* 998 F.3d at 692.

As such, Plaintiff Adaramaja, like the plaintiff in *Cranor*, sustained an injury bearing a close relationship to public nuisance because she "wants to use our Nation's telecommunications infrastructure without harassment" and "[i]n that sense, [s]he's similar to someone who wants to use another piece of infrastructure like a road or bridge without confronting a malarial pond, obnoxious noises, or disgusting odors." *Id*. Other courts have also agreed. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 (9th Cir. 2022) (agreeing that TCPA violations bear a close relationship to common law public nuisance, amongst other torts); *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 959 (8th Cir. 2019) (same, and noting that it did not matter that "the harm suffered here was minimal; in the standing analysis we consider the nature or type of the harm, not its extent.").

**II.     This Court Should Apply the "Kind, Not Degree" Approach to the Standing Analysis.**

As set forth herein, every other appellate court to address standing in the context of the TCPA has applied a "similarity in kind, not degree" approach—or substantively similar language, such as "type vs. extent"—in considering whether there is a sufficient common-law analogue. *See Gadelhak*, 950 F.3d at 462 (in addressing whether there is a close relationship to a common law claim, "we are meant to look for a 'close relationship' in kind, not degree."); *Cranor*, 998 F.3d 686 ("Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable."); *Krakauer*, 925 F.3d at 652-53 (because "[o]ur inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable[,]" Article III standing can be established even if the allegations "would [not] support a common law cause of action"); *Susinno*, 862 F.3d at 352 (Article III standing established where Congress was not "inventing a new theory of injury[,]" but rather "elevat[ing] a harm that, while previously inadequate in law, was of the

6

same character of previously existing legally cognizable injuries"); *Golan*, 930 F.3d at 959 (receipt of two voicemail messages established Article III standing notwithstanding that the harm was "minimal" because "in the standing analysis we consider the nature or type of the harm, not its extent."). This is consistent with Plaintiff's argument, *supra*, that the proper historical analysis is identifying what types of disputes the common law indicates are within the purview of the courts.

Recently, Judge Newsom posited that this "kind, not degree" approach should be the governing analysis whenever Article III standing is at issue in the context of statutorily created causes of action. *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1256 (11th Cir. 2022) (dissenting). The majority acknowledged that such approach "may well be a helpful explanatory tool in other cases—just not the one we have here." *Id*. at 1249. Because the plaintiff "did not allege any publicity at all"—publicity being a necessary element to the purported common law analogue in *Hunstein*—there was nothing to compare. As such, "[t]o the extent that we need to build on [the similar in kind, not degree] approach, it will have to wait for a case when the plaintiff actually pleads a harm that is smaller in degree rather than entirely absent." *Id*. This is precisely that type of case: As *Gadelhak* and *Cranor* explain, the harm of receiving multiple unwanted text messages is smaller in degree than that which is necessary to state a valid common-law cause of action—a question unrelated to standing—but it is not entirely absent.

As such, the "element-by-element" analysis in *Hunstein* can be synthesized with the approach utilized in *Gadelhak*, *Cranor*, *Krakauer*, and *Susinno*. So long as each element is subject to comparison, the comparison itself turns on similarities in the quality (i.e., kind), not quantity (i.e., degree). Such analysis shows Article III standing is established here. Even at common law, intrusion upon seclusion could be met by showing a physical ***or electronic*** intrusion, and could be met by showing an intrusion

into a person's solitude or seclusion, not merely their private affairs.[2] *See Agency for Health Care Admin. v. Associated Indus.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996); *Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 656 (Fla. Dist. Ct. App. 2021). So, even if receiving unwanted telemarketing text messages would not be "highly offensive" to the average person—a questionable assumption[3]—and even if multiple texts are not a big enough intrusion at common law, each element is subject to comparison, not absent entirely. *See Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) (because intrusion upon seclusion was a closely related common law analogy, whether the complained-of conduct was "highly offensive, moderately offensive, or slightly offensive" is irrelevant to the Article III analysis); *see also* Compl. at ¶¶ 4, 44 (alleging the unwanted text messages were annoying, aggravating, an invasion of privacy, inconvenient, and a nuisance). This is close enough, given that Article III standing turns on whether there is a "close relationship," not an "exact duplicate." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2209 (2021); *accord Hunstein*, 48 F.4th at 1242.[4]

In sum, and respectfully, there is no reason to deviate from the cogent analysis and standard applied by Judges Barrett, Oldham, Hardiman, Grasz, and Wilkinson. Because the intangible harm identified and elevated to the status of legally cognizable by the legislature bears a "close relationship"

---

[2] This is why hounding phone calls were sufficient at common law, notwithstanding that the caller was not discovering or witnessing private matters or facts.

[3] *See Barr*, 140 S. Ct. at 2343 (2020) ("Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints."); *Cranor*, 998 F.3d at 688 ("Robocalls and robotexts are nuisances…But as every American knows, there are companies—like the defendant in this case—who refuse to get that message while collectively sending millions of others.").

[4] Even then, "close" is doing a lot of work. For example, what "close relationship" does "the desire to use or observe an animal species, even for purely esthetic purposes," which is "undeniably a cognizable interest for purpose of standing[,]" have with a common law harm? *Lujan*, 504 U.S. at 563. Or what about the harm of a decrease in the "aesthetic and recreational values" of a public park? *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).

in kind, if not degree, to the harms imposed by intrusions upon seclusion and public nuisances, jurisdictional standing is established here.

### III. Plaintiffs Possess Article III Standing for Their FTSA Claims.

Plaintiffs allege that they received several unwanted robotexts placed by Defendant. The dispositive question is, considering the Florida legislature's judgment and with an eye towards similarities to historically recognized harms, whether receiving eleven unwanted robotexts constitutes a harm that, while intangible, is "real" and "actually exists" such that it is a concrete harm.

#### A. *The Florida Legislature Adjudged Unwanted Robotexts to Constitute Invasions of Privacy Worthy of Legal Recourse.*

When addressing congressional judgment—here, the Florida state legislature[5]—the question is whether the harm at issue is consistent with harm identified by the legislature and the interest it sought to protect. Here, in enacting the FTSA, the Florida legislature focused on precisely the type of harm Plaintiff complains of: companies/individuals like Defendant placing unwanted telemarketing robotexts to consumers. Indeed, the Florida legislature made clear that it amended the FTSA to combat unwanted calls and texts that had resulted in 293,071 complaints from Florida consumers in 2020 alone. *See* Bill Analysis and Fiscal Impact Statement.[6] The Florida legislature noted that a Supreme Court decision had rendered the TCPA "obsolete," and so it added a cause of action to the FTSA to provide consumers

---

[5] Although the Supreme Court has not addressed the question, it appears all courts agree that there is no meaningful distinction between a federal statutory cause of action and a state statutory cause of action when it comes to analyzing legislative judgment. *See, e.g.*, *Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 953 (N.D. Cal. 2018) ("[T]here is no good reason why the judgment of a state legislature should be treated as less important than that of Congress in deciding when the violation of a statutory grant in itself amounts to a real and concrete injury."); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 639 (E.D. Mich. 2017) (the Article III analysis is the same whether Congress or a state legislature established the statutory cause of action for intangible harms). And this Court "assumed without deciding" that state legislatures can, like Congress, "elevate to the status of legally cognizable" injuries that were previously inadequate at law. *United States v. Mortg. Inv'rs Corp.*, 987 F.3d 1340, 1358 (11th Cir. 2021).

[6] www.flsenate.gov/Session/Bill/2021/1120/Analyses/2021s01120.pre.rc.PDF.

with recourse. *Id.* at 3. And unlike their federal counterparts, the Florida legislature specifically addressed robotexting, not merely robocalling. Fla. Stat. § 501.059(1)(j) (defining "telephonic sales call" to mean "a telephone call, ***text message***, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services…") (emphasis added).

In other words, a legislature can essentially lessen the threshold of that which would be necessary to prove a common law cause of action. *See generally Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 652-53 (4th Cir. 2019) (because "[o]ur inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable[,]" Article III standing can be established even if the allegations "would [not] support a common law cause of action"); *Susinno v. Work Out World Inc.*, 862 F.3d 346, 352 (3d Cir. 2017) (Article III standing established where Congress was not "inventing a new theory of injury[,]" but rather "elevat[ing] a harm that, while previously inadequate in law, was of the same character of previously existing legally cognizable injuries") (quotations omitted). For example, at common law, a person possessed a claim for intrusion upon seclusion based on receiving unwanted phone calls so long as they were sufficiently numerous and "hounding." Restatement (second) of Torts § 652B, cmt. b, illus. 5; *Carey v. Statewide Fin. Co.*, 3 Conn. Cir. Ct. 716, 223 A.2d 405, 406-07 (Conn. Cir. Ct. 1966); *Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340, 344 (Ohio 1956); *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 84-85 (Tex. App. 1998). Congress can, however, pass a law that—to pick a totally random example—makes it actionable even if a telemarketer places only a few unwanted calls. After all, receiving eleven annoying, intrusive, unwanted calls is the same type or kind of harm as receiving thirty—it's just less of the same kind of harm. And if a plaintiff sustains the very harm identified by Congress as that which it sought to protect, a plaintiff "need not allege any additional harm beyond the one Congress has identified." *Cordoba*, 942 F.3d at 1268 (quoting *Spokeo*, 136 S. Ct. at 1549).

Because Plaintiffs sustained the very injury the FTSA was designed to prevent and for which it provided a remedy, they need not allege any "additional harms" beyond the statutory violation. *See Spokeo*, 136 S. Ct. at 1549; *Cordoba*, 942 F.3d at 1270; *Perry v. CNN, Inc.*, 854 F.3d 1336, 1340 (11th Cir. 2017) (finding Article III standing was established even though the plaintiff "does not allege any additional harm beyond the statutory violation" because the invasion of the statutorily created private right was by itself a concrete injury) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (instructing that injury in fact "may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'")). And on this first factor, the Florida legislature's judgment that the receipt of unwanted robotexts is worthy of legal recourse counsels in favor of finding the intangible harm Plaintiffs sustained was "real" and "actually exists"—in other words, it was concrete. *Cf. Ramirez*, 141 S. Ct. at 2204 ("Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation").

In *Muccio v. Glob. Motivation, Inc.* – on which Defendant will likely rely (and which is on appeal) – the court relegated its analysis of this critical factor to a footnote, asserting merely that it "decline[d] the invitation" to "treat the standing analysis differently for [the] FTSA claims" than for the TCPA claims. No. 22-81004-CIV-CAN, 2022 U.S. Dist. LEXIS 231882, at n.2 (S.D. Fla. Dec. 22, 2022). Given that the Florida legislature specifically identified telemarketing robocalling as a harm it sought to prevent while, as *Salcedo* noted, Congress did not, the holding was, respectfully, incorrect. Indeed, the Supreme Court **requires** courts to look to legislative judgment for guidance, even if that guidance is not dispositive. *TransUnion*, 141 S. Ct. at 2204. By declining the invitation to consider the difference between the FTSA and the TCPA, the *Muccio* court necessarily declined to consider legislative judgment at all.

Respectfully, this Court should not "substitute [its] judgment for Congress's"—or, here, a state legislature—on whether the harm should be legally vindicable. *Jeffries v. Volume Servs. Am.*, 928 F.3d 1059, 1070 (D.C. Cir. 2019) (Rogers, J., concurring). By doing so, this Court will properly heed the Supreme Court's directive to observe that "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo*, 578 U.S. at 341. Of course, that legislative guidance is not dispositive. However, that Article III standing doctrine is based on the "single idea" of separation of powers. *TransUnion*, 141 S. Ct. at 2203 (citation omitted). There is simply no question that the Florida legislature was fulfilling a legislative role—to allow courts to come to a different legislative conclusion on whether the violation of a right merits legal recourse would misalign the role of a judge vis a vi the role of a legislator. So, the question becomes whether adjudicating alleged violations of the law would transform a court into something that it is not. And here, adjudicating nuisances and intrusions upon seclusion and privacy is comfortably within the historical province of the court. Indeed, far from simply inventing a nonexistent harm out of thin air, the harm identified and elevated by the Florida legislature—"annoying," "disruptive," and "intrusive" robocalling, concerning which Americans are "united in their disdain"[7]— is closely related to several common-law analogues.

### B. This Court is not Bound by <u>Salcedo</u> for its FTSA Standing Analysis.

It must be emphasized that *Salcedo*—which held that a single unwanted text message placed in violation of the TCPA is insufficient, by itself, to satisfy Article III—is not binding with respect to the

---

[7] *See Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020) ("Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints."); *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 649 (4th Cir. 2019); *Cranor*, 998 F.3d at 688 ("Robocalls and robotexts are nuisances…But as every American knows, there are companies—like the defendant in this case—who refuse to get that message while collectively sending millions of others.").

FTSA standing analysis. The holding of a case is necessarily confined to the facts and TCPA claim presented and, notably, a TCPA claim that did not involve DNC violations. *See Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1031 (11th Cir. 2003) ("[T]he holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision.") As such, "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). *Salcedo*'s overall analysis and any dicta "is not binding on anyone for any purpose." *Id.* (citations omitted). The facts in *Salcedo* entailed receipt of a single unwanted text in violation of 47 U.S.C. § 227(b); thus, *Salcedo* is binding on constituent district courts only to the extent the same facts are presented. The operative pleading here presents different facts and claims. Plaintiffs received numerous unwanted messages, placed in violation of different statutory schemes.

Most critically, as Judge Branch noted, Congress said absolutely "nothing" about text messages. *Salcedo*, 936 F.3d at 1168-69. By contrast, the Florida legislature explicitly prohibited not merely voice phone calls, but also telemarketing text messages. *See* Fla. Stat. § 501.059(1)(j). As the Eleventh Circuit noted, the TCPA's silence on unwanted texts while highlighting unwanted calls is, at least in part, the reason why the Court held that receipt of an unwanted call establishes Article III jurisdiction, per *Cordoba*, while receipt of an unwanted text does not. *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990, 998-99 (11th Cir. 2020). The Florida legislature, in effect, weighed the competing interests at issue, just as courts did at common law, and altered the common law requirements ***only in the specific context of telemarketing***. This is sensible: Courts have long noted that commercial speech is of less value than other types of speech and holds a "subordinate position in the scale of First Amendment values[,]" *Fla. Bar v. Went for It*, 515 U.S. 618, 623 (1995), and almost everybody disdains telemarketing robocalling. In so doing, the Florida legislature was operating as a legislature; by adjudicating violations thereof

13

brought by a specific target of the violative conduct, courts will be acting as a court. No separation of powers principle is implicated.

Moreover, *Salcedo* concerned a single text message, while Plaintiffs here received multiple unwanted text messages. The court in *Muccio* rejected that eleven text messages is different than a single text message because of the statement that "the assessment today is thus qualitative, not quantitative." 2022 U.S. Dist. LEXIS 231882 (citing *Salcedo*, 936 F.3d at 1173). Respectfully, equating the qualitative/quantitative distinction as pertaining to the quantity of texts received entirely misses *Salcedo*'s point. The Eleventh Circuit was explaining that the issue was not about the quantity, but rather the quality, ***of harm***—Article III is concerned not with the amount of harm sustained, but with the type of harm sustained. For example, a person might be legitimately devastated or horrified by some action or inaction taken by the government relating to public policy. She would be far more harmed, in the colloquial sense, then someone who, say, received an unwanted fax transmission. *Cf. Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) (Article III standing established based on receipt of an unwanted fax).

The latter is insignificant, but concrete, while the former is significant, but not concrete. And Article III is concerned with the type or quality of the harm (concrete vs. not concrete) rather than the amount or quantity of harm (significant vs. very tiny). Under the *Muccio* court's theory, receiving eleven text messages in violation of the FTSA's specific prohibition against placing text messages without consent does not confer standing—but surely, at a certain point, it would. Perhaps 10? 15? 20? What if someone received a text once an hour from eight until eleven every day for a month, or six months, or a year? The necessary implication of the district court's theory, in other words, is that constitutional standing depends on receiving a magic number of text messages somewhere between more than five and less than an amount that would suffice to state a common law claim. But if so, then the only

difference between standing and no standing is quantitative—six is a sufficient quantity, perhaps (or 15, or 20, or whatever it is), but five is not (or 14, or 19, etc.). *Salcedo* itself forecloses that supposition.

*Salcedo* is better understood as distinguishing between receiving a single text message and receiving multiple text messages—just as it was understood by one of the panelists. *See* 936 F.3d at 1174 ("I write separately to emphasize my understanding that…the conclusion that Salcedo lacks standing is driven by the allegations in his complaint that Hanna sent him only one text message. The majority opinion…leaves unaddressed whether a plaintiff who alleged that he had received multiple unwanted and unsolicited text messages may have standing to sue…"). This is because, at its core, intrusion upon seclusion provided recourse for ***repetitious*** intrusive calls. Under this view, while receiving multiple text messages may have negligible impact on the quantity of harm compared to receiving a single text message, it changes the quality of the harm by introducing the component of repetition necessary for intrusion upon seclusion. And once the element of repetition is introduced, it is irrelevant that a few unwanted text messages would not be ***enough*** repetition at common law because the analysis is "qualitative, not quantitative." *Id*. at 1173.

If, on the other hand, Defendant is correct that the logic of *Salcedo* would apply to foreclose finding Article III is established for the FTSA claims, Plaintiffs respectfully submit *Salcedo* is unpersuasive, conflicts with every other appellate court, has been called into serious question by *TransUnion*, and is likely to be overturned by *Drazen*. First, one way of interpreting *Salcedo*—the way the *Muccio* court interpreted it—is as analyzing whether the ***degree*** of statutorily-proscribed harm is comparable to a harm supporting a common-law cause of action. For example, *Salcedo* arguably posited that intrusion upon seclusion is not a common-law analogue to receiving an unwanted call because the "allegations fall short of th[e] degree of harm" necessary to establish the common-law tort: At common law, unwanted phone calls needed to be "persistent[]" and "frequen[t]." 936 F.3d at 1171. The Court

15

also rejected nuisance as an analogue because "disturbance and annoyance [] do not in themselves necessarily give rise to an invasion of a legal right." *Id*. In making the analogy, *Salcedo* appeared to consider whether the harms are similar "both in kind and in degree." *Id*.

As then-Judge Barrett explained, however, if this was indeed *Salcedo*'s approach, it is not the proper one—the only question is whether the intangible harm identified by Congress is similar ***in kind*** to a common-law analogue. *Gadelhak*, 950 F.3d at 462 (criticizing *Salcedo* because "we are meant to look for a 'close relationship' in kind, not degree."). That an intangible harm is less in degree than that necessary to prevail on the merits of a common-law tort is irrelevant, because the entire point is that Congress can elevate harms that would not have supported a common law claim to a legally vindicable status. *Id*. at 462–63.

> A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same kind of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.

*Id*.; *see also Krakauer*, 925 F.3d at 652-53; *Susinno*, 862 F.3d at 352.

The Fifth Circuit agreed with all other courts, including *Gadelhak*. *See Cranor*, 998 F.3d 686.

> *Salcedo*'s focus on the substantiality of the harm in receiving a single text misunderstands *Spokeo*. Our inquiry is focused on types of harms protected at common law, not the precise point at which those harms become actionable. *Salcedo*'s focus on the substantiality of an alleged harm threatens to make this already difficult area of law even more unmanageable. We therefore reject it.

*Id*. at 693 (cleaned up); *see also Williams v. Myler Disability, LLC*, No. 3:20-cv-00275-FDW-DCK, 2020 U.S. Dist. LEXIS 211914, at *12–15 (W.D. N.C. Nov. 12, 2020) (criticizing *Salcedo* and noting that it conflicts with all other Circuits); *Cross v. State Farm Mut. Auto. Ins. Co.*, No. 1:20-cv-01047, 2022 U.S. Dist. LEXIS 10676 (W.D. Ark. Jan. 20, 2022) (rejecting *Salcedo* because it improperly focused on the "severity" of the harm, rather than merely the "kind" of harm).

The Supreme Court offered telling clues to which approach it believes is correct in *Ramirez*. Notably, the Court favorably cited *Gadelhak* as an example of how Congress can identify and elevate a harm similar in kind to a common-law analogue. *Ramirez*, 141 S. Ct. at 2204. It is also instructive ***why*** standing was established (for some class members) in *Ramirez*, which involved a class of persons about whom TransUnion included in their credit file certain negative information in violation of FCRA. *Id*. at 2200-01. Out of the class of 8,185 persons, 20% had their credit reports shared with a third party—the remainder personally received the inaccurate report, but a third party did not. *Id*. at 2200-01, 2208.

The Court found standing present for the 20% of the class whose reports were disseminated to third parties because the disclosure bore a close relationship to defamation. *Id*. at 2208-09. Critically, the fact of disclosure—alone—was sufficient. There was no quantitative analysis at all—no measurement of how harmful the disclosure was, its impact, or mens rea. It did not matter that the information was not technically false nor whether the recipient ever saw it, reviewed it, cared about it, or made a decision based on it. One can easily imagine that some class members' credit report was ordered by someone who knew them quite well—an extended family member or close friend who owns a car dealership, for example. In such a scenario, that the credit report flagged the class member as a potential terrorist would likely be a source of amusement, not "harm" in the colloquial sense. Yet the Court found standing existed even at the trial stage by the fact of disclosure alone. Said another way, the publication of a false (at common law) or misleading (under the FCRA) statement is by itself an intangible harm; that someone believes the statement is an additional harm—and may be necessary to show actual damages—but it is not necessary for purposes of jurisdictional standing. As such, *Ramirez* confirmed that the "degree" of harm simply did not matter. Once there is a sufficiently close common law analogue in kind, the inquiry ends.

*Salcedo* is capable of being interpreted—and Plaintiffs believe it should be interpreted—as consistent with the aforementioned authorities. Under this view, the reference to "significant differences in the kind and degree of harm" between the TCPA and common-law analogues, *Salcedo*, 936 F.3d at 1172, was not meant to imply that both are necessary. Rather, it was meant to point out significant differences ***not just*** in degree (which is not enough), ***but also*** in kind (which is dispositive). If so, then *Salcedo* is not inconsistent with *Gadelhak*. The Eleventh Circuit held that one text message was not enough. *Id*. at 1173. The Seventh Circuit held that multiple text messages are enough. *Gadelhak*, 950 F.3d at 463. And the difference between receiving one unwanted text message and multiple text messages—the introduction of repetitiveness, insistency, pressure to respond—are precisely the type of things required by the common-law intrusion upon seclusion based on unwanted phone calls, albeit at a larger scale. Receiving one unwanted call, under this view, is different both in kind and in degree from receiving repetitive, "hounding" calls. Receiving multiple unwanted calls is different in degree from receiving multiple calls in an amount sufficient to be considered "hounding," but not in kind. So, under this view, *Salcedo* and *Gadelhak* were both correctly decided.

Plaintiffs believe that had the *Salcedo* panel addressed multiple text messages it would have found such repeated messages tipped the scales into something sufficiently close in kind to the "hounding" requirement necessary to an intrusion upon seclusion tort such that Article III is satisfied, even if eleven calls are probably still not quite enough for a cognizable common law claim on the merits.[8] But to the extent it considered relevant the ***degree*** of harm, such approach is inconsistent with Supreme Court guidance, as every circuit court agrees is the case and as the Court confirmed in *TransUnion*. And because this Court is not bound by *Salcedo*, it certainly should not ***extend*** its holding

---

[8] Again, it cannot be the case that *Salcedo* was requiring the elements of intrusion upon seclusion to be met to establish constitutional standing. Otherwise, Congress would be unable to "elevate" an injury at all—it could do no more than codify common law causes of action.

18

to apply to multiple text messages, thereby conflicting both with the persuasive reasoning of all other Circuits and with Supreme Court guidance.

As such, this Court can give "fresh consideration" to the question of whether Article III standing is established where a plaintiff receives multipler text messages placed in violation of the FTSA. This is something the recent cases on which Defendant relies did not do.

## CONCLUSION

Justice Scalia described standing as the answer to "the very first question that is sometimes rudely asked when one person complains of another's actions: 'What's it to you?'" So, "what's it to" Plaintiff? Plaintiffs' privacy rights were invaded by multiple telemarketing robotexts hawking Defendant's products, which annoyed and aggravated them given that, like virtually all Americans, they despise telemarketing robocalls and robotexts. Congress and the Florida legislature deemed this harm worthy of legal recourse and gave Plaintiffs the right to be free from such telemarketing robotexts, and they seeks the statutory damages to which Congress and the Florida legislature says they are entitled. And if the question is whether there is anyone who thinks such telemarketing is actually harmful, the answer, to borrow a phrase, is legion: Congress, thousands of lawmakers in numerous states, including Florida, millions of Americans, dozens of governors, who have signed substantively similar telemarketing robocall legislation, Judges Coney-Barrett, Wood, Kanne, Hall, Lynch, Englemayer, Tymkovich, Hartz, Phillips, Oldham, Stewart, Davis, Tallman, Berzon, Christen, Grasz, Smith, Wollman, and dozens of district courts, along with hundreds of juries across the country who have entered verdicts against defendants for illegal telemarketing robocalling or robotexting.

To adjudicate the alleged conduct at issue here would not implicate any separation of powers principle. Congress and the Florida legislature simply identified a historically recognized harm and made it easier to vindicate. "The province of the court is, solely, to decide on the rights of individuals,"

19

*Marbury v. Madison*, 5 U.S. 137, 170 (1804), and to adjudicate the claims at issue here would be to "decide on the rights of individuals." Repetitive, insistent invasions on the solitude and seclusion of an individual were a recognized harm at common law, and to adjudicate allegations of such invasions is within the province of the judicial branch. If the sole basis of Article III standing doctrine is to make sure each branch of government sticks to its role—and it is—then Article III cannot prevent Plaintiffs from prosecuting their claims.

*Ramirez* leaves courts with broad discretion—subject to the opinions of superior courts—in determining what counts as "close" enough in looking to common law analogues. Respectfully, this Court should exercise its discretion in a manner that respects the very separation of powers principle that Article III is designed to enforce. As such, Defendant's Motion should be denied.

**WHEREFORE**, Plaintiffs respectfully requests an order denying Defendant's Motion, and for such other relief deemed appropriate by the Court.

DATED: June 1, 2023

Respectfully submitted,

**HIRALDO P.A.**

*/s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954.400.4713